## Amick v. First Nat. Bank of Pikeville.

Oct. 3, 1941.

636

W. W. Reynolds for appellant.

O. T. Hinton for appellee.

OPINION OF THE COURT BY MORRIS, COMMISSIONER—
Reversing.

On August 7, 1933, an insurance company delivered to appellant a check for $1,280.36 in payment of a life policy. The day following she went to the bank of appellee, defendant below, indorsed and handed it to I. E. Brooks, then assistant cashier, directing him to place $280.36 to her checking account, and the balance to a savings account. Brooks promptly credited the first sum to her checking account, but instead of entering any balance to savings account took $1,000 in currency from the till and placed in it a lock box to which he had a key.

Mrs. Amick did not learn how the transaction had been handled until several years thereafter, nor what had actually transpired until Brooks in 1935 returned from service of a short sentence for embezzlement. Mrs. Amick made demand of the bank for recompensation to the amount of $1,000; the bank refusing to comply, the suit out of which the appeal grows was instituted against the bank, and in which recovery of the above amount was sought.

Appellee admitted the delivery of the check to Brooks, but says that the $1,000 was delivered to him to keep for Mrs. Amick, and being a personal transaction it was not to be held responsible. It also plead that

Brooks at times made deposits of various sums to appellant's checking account, and also took up two of her checks which did not go through the account, so that she had actually received use of cash in excess of the $1,000. A controverting reply joined the issue.

The action filed was in ordinary, but upon statements of counsel the court sua sponte transferred the case to the equity docket, and it proceeded accordingly. Civil Code of Practice, Section 10, Subsection 4. There is no contention here that under the facts as detailed, the bank is not liable for any portion of the $1,000 which the proof shows she did not receive either by deposits by Brooks or payment of appellant's checks.

The matter was referred to a special commissioner who heard proof, and filed his report, which in form and substance manifests a careful consideration, and as we have concluded reflects the true status of appellant's claim against the bank. Appearing as witnesses were both Mrs. Amick, and Brooks who mishandled the proceeds of the check. While Mrs. Amick's testimony was not satisfactory as to her actions in making deposits after the transaction of August 8, 1933, her evidence, together with that of Brooks, was sufficient to authorize a judgment in her favor and although in brief she is claiming more than the commissioner approved for judgment, she is bound to his findings since she did not tender or file exceptions to the report. Town of Highland Park v. Wilson, 186 Ky. 233, 216 S. W. 370.

Brooks admitted that he had gotten into difficulty in handling funds of the School Board, and a secret society in Pike County. He was sure that Mrs. Amick requested him to place the $280.36 to her checking account, but "did not recall" that she directed him to place the $1,000 to savings. He had a key to a box not then in use and in this he placed the $1,000 and other funds. He gives as his reason, that since he and Mrs. Amick were good friends and she was being pressed by creditors, and not a good business woman, he would undertake to handle the $1,000 for her and pay it out as needed. The method used by Brooks was as follows: When Mrs. Amick would issue a check against her account, and it developed that she had no balance, or not sufficient to meet the check, he would deposit to her credit in most cases, the amount required to meet the check. This was

carried on for a time and until the bank or its officers discovered the irregularities of Brooks.

It is hardly necessary to go into a detailed statement of the facts with relation to the condition of appellant's account, further than as developed in the enlightening report of the Commissioner. The facts as detailed by Brooks show a distressing situation. He was using money which belonged to others, at least for a part of the time, in playing the stock market, always with the hope that his speculations would soon place him in a position where he could square all accounts. The failure to accomplish his purpose led him to the excessive use of alcoholic stimulants and sedative drugs.

After the prosecution was begun in 1935, Brooks, in a written communication to his attorney, recited in detail the whole transaction. In this he said that it was his good faith purpose to place the currency in the box so as to protect Mrs. Amick from annoyance by creditors, some of whom were then rather insistent. He and appellant's husband, prior to his death, had together dealt with the stock market, and Mrs. Amick had suggested some stock dealing, but he opposed the plan. At some point he had received reliable information which induced him to buy certain stocks "for quick profit." He used $1,950 of the School Board's money and made a respectable profit. This did not clear him up, so later he was "taking everything on a final swoop, a desperate effort to come out." He went to the box and found that there was about $400 of Mrs. Amick's money remaining. He made a hasty examination of her account and found for certain that he had deposited $550, and was of the impression he had taken up some checks of hers which would increase the amount to about $575.

So, with intent of helping Mrs. Amick he opened a brokerage account with $100 of the $400; the brokerage firm went bankrupt. He then opened a joint account with a Mr. Ward with the remaining $300. He doesn't say what happened here, except that "something went wrong." The use of intoxicants and drugs worked on him to the extent that he was "just like a prize fighter on the floor that could not answer the bell."

In his examination he took up item by item the credits claimed by the bank. As to those which were shown to have been deposited by him in the capacity of

assistant cashier, he was fairly certain. As to those made by other bank employees, he had little recollection or knowledge, and the same was true in respect of a few checks which he thought he had met, they not going through the account.

Mrs. Amick was positive about her direction as to the disposition of the $1,000; Brooks was uncertain. It is shown in the proof that Mrs. Amick had during the period deposited other sums to her account. While it may be admitted that she was not par excellent as a business woman, it is shown that she had transactions which brought her in considerable cash at various times. She was working after the death of her husband, keeping boarders who sometimes paid her in cash, sometimes in checks; she had sold some household equipment for $450, which was paid in installments. There were other cash transactions, deposits, for which she could not show slips, but these or most of them, are reflected in the commissioner's report.

The commissioner in his report, which is made in detail with various tabulations, made up from inspection of the bank records, and such deposit slips as were available, and other proof, found that from the date of the deposit of the $280.36 to March 4, 1935, Mrs. Amick's account showed total deposits of something over $1,200. In another table she showed the dates of deposits at various times when she did not have sufficient balance to meet current checks, for example, on April 4, 1934, she had on deposit $10.77 against which she had given a check for $11. Twenty-three cents was the amount necessary to meet the check, and Brooks' deposit slip showed a deposit to her account of 25c, and so on through the period.

The account showed deposits in this manner to the amount of $813.05. There were deposits made to the amount of $163 at times when Mrs. Amick had more than enough to meet current checks, and at times when no checks were outstanding. In addition there were check deposits by Mrs. Amick, which totalled about $198. No question was raised by the bank as to these deposits, nor is it claimed that Brooks made these deposits from the box.

There was no dispute as to the original $280.36 check, and it should not have been involved in the final

accounting. Nor does Mrs. Amick raise any question as to her drawing the checks against her account, so the commissioner found the only problem to be to determine which of the cash deposits came from the $1,000 in the safety box, and what sums, if any, Brooks had paid out for her. The commissioner took into consideration the original and subsequent deposits, and then showed by books, deposit slips and other proof, that of the original $1,280.36 she had, in the manner stated, received the use of $916.41.

He also found that Brooks had presented to his attorney three checks drawn on the bank for sums totalling $27.58, which he did not allow because they showed no evidence of having gone through the bank, nor from what funds these checks were paid. The commissioner's conclusion was that since Mrs. Amick had received and used $916.41 of the proceeds of her check, but that the bank, upon whom the burden rested since it admitted the receipt (by Brooks) of the check, and had plead full payment (Phillips Ex'r v. Reid, 268 Ky. 317, 104 S. W. (2d) 1093, and cases cited), had failed to establish restoration to the amount of $363.95, for which sum he recommended judgment with the prevailing rate of interest from the date of the delivery of the check.

The bank filed exceptions based on the ground that the commissioner had refused to allow credit for the three checks turned over by Brooks to his attorney; because he had failed to allow other credits of deposits apparently made by Brooks, and credits of deposits shown to have been made through cashiers other than Brooks, totalling approximately $390.

Upon submission the court directed the entry of a judgment directing that Mrs. Amick should recover of the bank the sum of $1,280.36 with interest from August 7, 1933 (date of delivery of check to Brooks), at the rate of 3%, apparently the prevailing savings account rate. The total was also to draw interest from August 25, 1937, at the rate of 6%. The judgment then recited that the total of $1,280.36 be subjected to the "following credits," first allowing the $916.41 recommended by the commissioner, but adding in specific detail all the credits claimed by the bank, except two items, one of $27 and another of $21.

The effect of this was to charge Mrs. Amick's account with payments not made by Brooks from the safe-

ty box funds, as well as the checks turned over to the attorney which had never cleared through the bank, and the ultimate effect was to allow against the total deposit, if we may call it such, of $1,280.36, the bank's claims to a total of $1,279.79, which resulted in giving Mrs. Amick a judgment for 57c, plus the interest adjudged. The amount adjudged including interest, might well have been considered under the maxim "de minimis &c."

After a careful review of the evidence adduced, we have reached the conclusion that the report of the special commissioner reflected the determination of the one matter in issue, and that the court should have approved his report and followed his recommendation, as to recoverable amount. It follows that the judgment is reversed with directions to enter judgment for the amount found to be due by the commissioner, with interest at the then prevailing rate paid on savings accounts, such to be calculated on the sum of $363.95, from August 8, 1933, with interest at 6% on the principal sum of $363.95 from date of judgment until paid.

Attention of counsel for appellant is directed to Section 950-3, Kentucky Statutes, and rule 10 of the Court of Appeals dealing with appeals where the amount in controversy is more than $200 and less than $500. Here the court below granted the appeal. This did not confer jurisdiction on this court. The procedure directed should have been followed. However, the clerk's records show that appeal was granted by him. We have concluded that this may be and is treated as a motion for appeal (Central Wholesale Co. v. Yaden, 261 Ky. 703, 88 S. W. (2d) 693, and cases cited), and sustain the motion, reversing the judgment with directions above indicated.